FILED

2020 Aug-24  PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FSI GREEN PARK SOUTH PROPERTY, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:18-cv-1211-GMB |
| CITY OF PELHAM, ALABAMA, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the court is the Motion to Dismiss or, in the Alternative, for Summary Judgment filed by the City of Pelham, Alabama; the Board of Adjustments of the City of Pelham; the Planning Commission of the City of Pelham; the City Council of the City of Pelham; Robert Miller; and Gary W. Waters (collectively, the "defendants"). Doc. 57.  Plaintiff FSI Green Park South Property, LLC ("Green Park") has filed a response to the motion (Doc. 62), and the defendants have filed a reply brief in support. Doc. 63.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge.  After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the motion (Doc. 57) is due to be granted in part and denied in part.

# I. JURISDICTION AND VENUE

The court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction, nor do they contest that venue is proper in the Northern District of Alabama.  The court finds adequate allegations to support the propriety of both.

# II. FACTUAL AND PROCEDURAL BACKGROUND

The following is a recitation of the facts as alleged in Green Park's Second Amended Complaint. Doc. 53.  On August 5, 2016, Green Park purchased two manufactured home parks in Pelham, Alabama (the "City" or "Pelham"). Doc. 53 at 4.  Green Park valued the two manufactured home parks at more than $19 million. Doc. 53 at 4.  Green Park treats the two parks, Green Park South and Southgate, as one property. Doc. 53 at 4.  The combined property consists of 415 spaces for manufactured homes. Doc. 53 at 4.  Green Park generally owns the spaces and rents the land to its residents, who own the actual homes. Doc. 53 at 4.  However, Green Park does own 15 manufactured homes on the property, which it rents to tenants. Doc. 53 at 4.

Before it purchased the property, Green Park investigated the City's zoning laws and found that the use of the property for manufactured home parks did not conform with current zoning requirements. Doc. 53 at 5.  However, under Alabama law a preexisting nonconforming use is a vested property right. Doc. 53 at 5.  Thus,

use of the property for manufactured home parks had been lawful, albeit nonconforming, since the 1973 passage of a City zoning ordinance. Doc. 53 at 5. From the 1973 until the early 2000s, whenever a tenant vacated an individual space, "Green Park's predecessors-in-interest would re-let the empty spaces for the placement of manufactured homes." Doc. 53 at 5.

In 2003, the Pelham City Council adopted an update to the 1977 Pelham Comprehensive Plan (the "Comprehensive Plan"). Doc. 53 at 5.  The updated Comprehensive Plan designated the land on Green Park's property as a future greenspace or commercial center. Doc. 53 at 6.  In 2007, the City Council passed Ordinance No. 135-182, a new City zoning ordinance to replace the 1973 version. Doc. 53 at 6.  The ordinance's nonconforming use provision follows:

## ARTICLE XXVI - NONCONFORMING USES OF LAND AND BUILDINGS

**Section 1. Intent**. Within the districts established by this ordinance or amendments that may later be adopted, there exist lots, structures, uses of land and structures, and characteristics of use which were lawful before the ordinance was passed or amended, but which would be prohibited, regulated or restricted under the terms of this ordinance or future amendment. It is the intent of this ordinance to permit these nonconformities to continue until they are removed, but not to encourage their survival. It is further the intent of this ordinance that nonconformities shall not be enlarged upon, expanded or extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district. The provision[s] of this section shall not apply to nonconforming signs. Nonconforming signs are addressed in Article XXII - "Sign Ordinance."

**Section 2. Continuance**. A lawful nonconforming use existing at the effective date of this ordinance may be continued, except as hereafter

provided, although, such use does not conform with the provisions of this ordinance.

**Section 3. Restoration to Safe Condition**. Nothing in this ordinance shall prevent the restoration of any building or structure to a safe or sanitary condition when required by the proper authorities.

**Section 4. Restoration after Damages**. No nonconforming building or structure which has been damaged by fire or other causes to the extent of more than fifty (50) percent of its fair market value at the time of such damage shall be rebuilt or restored except in conformity with the provisions of this ordinance. If a nonconforming building is damaged less than fifty (50) percent of its current replacement value it may be rebuilt or restored and used as before the damage, provided that such rebuilding or restoration is completed within 180 days of the date of such damage. Moreover, all debris from the damaged structure shall be removed within 90 days from the date of such destruction.

**Section 5. Abandonment**. A nonconforming use which has been discontinued for a continuous period of 180 days shall not be re-established and any future use shall be in conformity with the provisions of this ordinance.

**Section 6. Change in Use.** A nonconforming use shall not be changed to another nonconforming use of the same or a less restrictive classification. A nonconforming use which is changed to a conforming use or to another nonconforming use of a more restrictive classification shall not be permitted to revert to the original or less restrictive use.

**Section 7. Abandoned Right-of-Way**. Whenever any street, alley or other public way is vacated or abandoned by official action of the City of Pelham, the zoning district adjoining each side of such street, alley or public way shall be automatically extended to the center of same and all area included therein shall then be subject to all appropriate regulations of the extended district.

**Section 8. Nonconforming Lot of Record.** An undersized lot of record that previously met lot size requirements under this Ordinance, but which has been made nonconforming in size by adoption of this Ordinance may be used as a buildable lot, as long as, all zoning

requirements (other than lot size and setbacks), ordinances, laws, and regulations are met.

Doc. 53 at 6–7.

On July 18, 2016, the City Council adopted the City of Pelham Highway 31 Corridor Redevelopment Plan ("Redevelopment Plan"). Doc. 53 at 7.   The Redevelopment Plan identifies a portion of Green Park's property as an area for redevelopment. Doc. 53 at 7.  Beginning in 2017, the City started to interfere with Green Park's use of the property. Doc. 53 at 9.  For example, Robert Miller, the City's building official, initially refused to approve a transfer of the property's master water heater from Green Park's predecessor to Green Park. Doc. 53 at 9. Once he approved the transfer, he told Green Park that the City would not permit it to place a new home on any empty spaces created by the removal of the existing manufactured homes. Doc. 53 at 9.

In the spring of 2017, counsel for Green Park sent a letter to the City's attorney requesting a meeting with City officials to "gain clarity" on the City's official position on Green Park's property and to "discuss Miller's statement." Doc. 53 at 9. In April 2017, counsel for the City responded and enclosed a June 2013 letter from the City to Green Park's predecessor explaining the City's position that any effort by Green Park "to move a new or used mobile home onto a lot that has been made vacant for any reason shall constitute a violation of the zoning provisions of the City of Pelham." Doc. 53 at 9.  The letter also referenced § 1 of Article XXVI of the 2007

zoning ordinance, which provided that the City would temporarily permit land uses "which were lawful before the ordinance was passed or amended, but which would be prohibited, regulated[,] or restricted under the terms of this ordinance or future amendment," but the City would not "encourage the[] survival" of these nonconforming uses. Doc. 53 at 9–10.

Green Park alleges that the City's 2013 letter to its predecessor marked a change in the City's interpretation of the 2007 zoning ordinance and in its treatment of manufactured home parks. Prior to 2013, "Green Park's predecessors-in-interest were allowed to re-let spaces on the [p]roperty as spaces became empty." Doc. 53 at 10. "The City's new position—that once a space becomes empty, Green Park cannot place a new or replacement home on the newly empty space—was not articulated or enforced prior to 2013." Doc. 53 at 10. Instead, even after the passage of the 2007 zoning ordinance, the City continued to permit Green Park's predecessors to add new homes to vacant spaces even though this usage was nonconforming under the law. Doc. 53 at 10. Thus, the City's change in its interpretation of the 2007 zoning ordinance "is essentially a change from applying the legal nonconforming status and application of the ordinance to the [p]roperty as a whole to a space-by-space application." Doc. 53 at 10.

On October 4, 2017, Green Park applied to the City's Board of Adjustment (the "Board") for a variance from the 2007 zoning ordinance so that it could install

a manufactured home on a vacant space on its property. Doc. 53 at 10–11.  In the application, Green Park explained that the placement of the new home on a vacant space would require a variance because it would be inconsistent with the City's interpretation of the zoning ordnance set out in the April 2017 letter. Doc. 53 at 11. Miller rejected the filing of the application and blocked it from consideration by the Board, which is the department of the City tasked with deciding variance requests. Doc. 53 at 11.  Later that month, Green Park filed an appeal of Miller's decision and an application for administrative review of the Mayor of Pelham's interpretation of the 2007 zoning ordinance's nonconforming use provision (as stated in the June 2013 letter from the City to Green Park's predecessor). Doc. 53 at 11.

On November 3, 2017, at the administrative hearing for both of Green Park's requests, the Mayor explained that "the City is taking steps to implement the Comprehensive Plan." Doc. 53 at 11.  The Board rejected Green Park's appeal of Miller's denial of its variance application and endorsed the Mayor's interpretation of the 2007 zoning ordinance's nonconforming use provision. Doc. 53 at 11.  Green Park appealed the Board's decision to the Circuit Court of Shelby County, Alabama. Doc. 53 at 12.  The court upheld the decision and denied Green Park's request for a variance, preventing Green Park from moving a new manufactured home onto the vacant space. Doc. 53 at 12.

In March 2018, Miller sent a condemnation notice to Green Park ordering it

to "perform repairs to nearly every home on the [p]roperty or to demolish them."
Doc. 53 at 12.  The letter required the repairs to be completed by May 16, 2018, and
warned that Miller would recommend to the City Council that the structures "be
demolished and removed with the costs to be paid by Green Park" if the repairs were
not completed. Doc. 53 at 12.  The notice enclosed an identical letter from September
2014 to the prior owner of the property. Doc. 53 at 12.  The letter failed to comply
with the City's notice requirements because it did not specifically explain how the
structures did not comply with its requirements or identify the alleged code
violations. Doc. 53 at 13.  The same month, the City sent a similar notice to the
owner of another manufactured home park in Pelham. Doc. 53 at 14.  The majority
of this manufactured home park's residents were Latino. Doc. 53 at 14.  The City,
by and through Miller, has threatened condemnation but failed to comply "with
applicable laws requiring the City to adhere to certain process and standards for
condemnation." Doc. 53 at 14.   The City also has failed to communicate its
decisions, including by neglecting to issue permit denials in writing and by refusing
to accept Green Park's application for a variance. Doc. 53 at 14.

On August 9, 2018, one week after Green Park filed this lawsuit, the Mayor
of Pelham made the following statement:

> Just this week the city of Pelham was served with a lawsuit by the
> owners of Green Park trailer park.  Eleven years ago you had a City
> Council that had the courage with public input to devise a
> comprehensive plan that clearly identifies the majority of the sub-

> standard housing in Pelham were [sic] manufactured homes. The City
> of Pelham adopted a policy that for whatever reason a mobile home is
> displaced from a mobile home community it cannot be replaced with
> another mobile home. We are being sued because of that. Now you
> talk about a density problem you look at the density problem at Green
> Park South and the 300 plus trailers . . . . This City Council had the
> courage to vacate Belle Vista. You talk about a hard day—we had 150
> people with picket signs marching in front of city hall when this council
> had the courage to vacate a mobile home park that was 80 percent
> Hispanic . . . . I just want you to consider what the alternatives are if we
> discourage the developers from improving our city. Something is going
> to be here so what is it going to be? Is it going to be a trailer park or is
> it going to be something like this?

Doc. 53 at 14–15. At the same meeting, members of the public expressed concern

that multiple families could be living in the same home. Doc. 53 at 15. Green Park

alleges that concerns over density and multiple families living in the same home

"may be coded expressions of racial animosity" toward the Latino community. Doc.

53 at 15.

In 2017, Green Park requested permits from Miller to make electrical repairs

to two homes on its property. Doc. 53 at 16. Miller orally denied the requests, citing

the ongoing dispute between Green Park and the City over Green Park's

nonconforming use of the land. Doc. 53 at 16. Because the 2007 zoning ordinance

requires permit denials to be in writing, Green Park requested a written denial of its

permit requests. Doc. 53 at 16. Miller then changed course and issued permits for

the electrical work in November 2017 and April 2018. Doc. 53 at 16. However,

Miller orally informed Green Park in May 2018 that he would not authorize the

restoration of electricity to the two homes "until every alleged instance of non-compliance on the [p]roperty is remedied." Doc. 53 at 16.  According to Green Park, Miller's continued refusal to correspond in writing has frustrated its ability to appeal his decisions and prevented it from developing a "paper trail" of the City's wrongdoing. Doc. 53 at 17.

Counsel for the City then sent Green Park a letter explaining that electricity could be restored to one of the homes (sited on lot 140), but not to another home (on lot D4) that had broken windows. Doc. 53 at 17.  Yet even after the windows of the home on lot D4 had been repaired, Miller still refused to authorize the restoration of electricity. Doc. 53 at 17.  He also told Green Park to communicate with the City through the City's attorney because Green Park had filed this lawsuit. Doc. 53 at 17.  According to Green Park, Miller refused to communicate with its representatives in retaliation for filing suit. Doc. 53 at 17.

On August 29, 2018, Miller sent a letter to Green Park stating that the City's building inspector had inspected lot D4 and found that in addition to the broken windows the home did not have an ad valorem tax sticker. Doc. 53 at 17.  This was the first time any City official had alleged any code violation for the home other than the broken windows. Doc. 53 at 17.  Throughout this time period, the home at lot D4 could not be occupied. Doc. 53 at 18.  Miller's letter explained that the City therefore considered the home to be abandoned under Article XXVI of the 2007 zoning

ordinance, which provides that when a nonconforming use is discontinued for a continuous period of at least 180 days the nonconforming use cannot be resumed and any future use must comply with current zoning requirements. Doc. 53 at 18. Green Park alleges that this letter evidences a "new strategy" by the City to "interfere with Green Park's vested right to use the [p]roperty for a manufactured housing park." Doc. 53 at 18.  "The City's interference now includes orchestrating a vacancy lasting longer than 180 days, and then declaring the nonconforming use discontinued, even if said homes are never removed from the [p]roperty." Doc. 53 at 18.

In late July 2019, Pelham police issued "municipal code violation warnings" to approximately ten Green Park residents for "yard parking." Doc. 53 at 18.  The citations referred to a City ordinance that has since been repealed and is no longer valid, and stated that the violations must be remediated within four days. Doc. 53 at 18.  The citations warned that violations "may subject you to arrest." Doc. 53 at 18. According to Green Park, this was "intended to intimidate and harass [Green Park] residents because the warnings have no legitimate law enforcement justification." Doc. 53 at 19.  The citations are a continuation of the "intensifying . . . campaign against Green Park and its use of the [p]roperty as a manufactured home park." Doc. 53 at 19.

While the Mayor of Pelham testified at the 2017 hearing that the City decided in 2002 that it would "no longer sustain manufactured home communities," and the City's decision to deny Green Park's appeal of its variance application "is evidenced by the City's Comprehensive Plan," the City has not provided any alternative plan for affordable housing in Pelham. Doc. 53 at 19.   The City's crackdown on manufactured homes began with the Mayor's election in 2012, who admitted that the City's current interpretation of the 2007 zoning ordinance's nonconforming use provision "has not been dealt with in the past." Doc. 53 at 19–20.   The manufactured home parks on Green Park's property have "existed for decades as supposedly disfavored nonconforming uses" under the 1973 zoning ordinance, which is "not materially different" from the 2007 zoning ordinance. Doc. 53 at 20.   Nevertheless, "the City's interpretation and enforcement of it has dramatically changed since 2012." Doc. 53 at 20.

Since 2000, the Latino population in Pelham has expanded significantly. Doc. 53 at 20.  Pelham's Latino population increased 246 percent between 2000 and 2010, and by 2010 approximately 15 percent of the City's residents were Latino. Doc. 53 at 29.  The manufactured home parks in Pelham, including Green Park's property, house a disproportionate share of Latino residents in comparison with other forms of housing. Doc. 53 at 20.  In fact, a substantial majority of Green Park's residents are Latino. Doc. 53 at 30.  According to Green Park, the City's efforts to rid Pelham

12

of manufactured home parks have intensified as the Latino population has grown. Doc. 53 at 20.   The City has engaged in a systematic campaign to close its manufactured home parks without regard to the rights of its Latino residents. Doc. 53 at 21.   On the other hand, Green Park's goal in managing the property is to "provide safe, clean, and affordable housing to those who wish to be a part of the City but whose income is below the median income of the City and who are unable to afford the median rental rate," but it is "disincentivized and thwarted by the [d]efendants' actions from investing in the [p]roperty and improving it." Doc. 53 at 21.

### III.  STANDARD OF REVIEW

In consideration of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is "plausible on its face" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." *Twombly*, 550 U.S. at 555.  Factual allegations need not be detailed, but "must be enough to raise a right to relief above the speculative level," *id.*, and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" will not suffice. *Iqbal*, 556 U.S. at 678.

## IV.  DISCUSSION

Green Park asserts six causes of action: two takings claims, two claims under the Fair Housing Act, one 42 U.S.C. § 1983 claim for an alleged violation of the Equal Protection clause, and a claim for injunctive and declaratory relief. Doc. 53 at 22–40.  The defendants seek a dismissal of all claims under Rule 12(b)(6) or, in the alternative, the entry of summary judgment under Rule 56.

## A.    Alternative Motion for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, if a party opposing summary judgment "shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition," the court may opt to defer consideration of the motion or deny it entirely. Fed. R. Civ. P. 56(d)(1).  Alternatively, the court is permitted to "allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d)(2).  Counsel for Green Park has filed a declaration attached to its response brief outlining Green Park's opposition to the timing of the instant motion for summary judgment. Doc. 62-8.

As the parties are well aware, this litigation is still at the factfinding stage.

14

The court first entered a scheduling order in October 2018 and the parties have been engaged in discovery ever since.  As Green Park notes, discovery "remains ongoing [and] the cutoffs under the scheduling order are still months away." Doc. 62 at 18; *see also* Doc. 62-8 (declaration filed by counsel for Green Park explaining that "[b]ecause discovery in this case is still in its infancy, Green Park has not had the opportunity to take any depositions to adduce testimony essential to oppose summary judgment").  This fact is underscored by the recent discovery dispute which resulted in two motions to compel centered on an agreement between the parties relating to a search by the City for electronically stored information ("ESI"). *See* Docs. 74 & 77.  This search is meant to uncover information in a host of City documents, emails, and other communications which could be relevant to Green Park's allegations of discrimination.

The remaining requests addressed in both motions also could uncover significant amounts of factual information relevant to Green Park's allegations and the defendants' countering assertions.  As evidenced by the length of time for which this litigation has been pending, the extent of Green Park's allegations, and the voluminous briefing devoted to both the motions to compel and the defendants' instant motion, this discovery process is ongoing, and the court anticipates that a significant amount of relevant factual information is yet to be disclosed.

In their reply brief, the defendants' primary justification for their motion for summary judgment, in addition to correctly noting that it is permitted by Rule 56, is that the record before the court is adequately "developed" due to the "variety of administrative and judicial proceedings that preceded" this lawsuit. Doc. 63 at 1. Those proceedings, however, do not resolve this case.[1] The evidence sought by both sides is directly relevant to Green Park's claims in this matter, which Green Park did not assert in any prior proceeding. Thus, Green Park should be granted the opportunity to develop a factual record to support its claims in this litigation and to adequately respond to a motion for summary judgment.

"[S]ummary judgment may only be decided upon an adequate record." *WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988). Where, as here, "the documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment," the nonmovant should be afforded the opportunity to use the tools of discovery to retrieve the information it seeks. *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988). Accordingly, the court declines the defendants' request to short-circuit the discovery process and rule on

---

[1] Moreover, none of this information is attached to the defendants' pending motion. *See generally* Doc. 58. The court assumes that the attachments to which the defendants refer in their present motion are Exhibits A–I attached to the defendants' prior motion to dismiss or, in the alternative, for summary judgment. *See* Doc. 34-1 at 1.

the limited facts available to the court at this stage.  Because any motion for summary judgment is premature, it is denied with leave to refile at the close of discovery.

## B.    Standing

The court therefore turns to the defendants' motion to dismiss.  The defendants first argue that Green Park does not have standing to bring its claims under the Fair Housing Act or the Equal Protection Clause of the Fourteenth Amendment[2] because the business relationship it maintains with its Latino residents is legally insufficient to confer standing. Doc. 57 at 31–34.  Green Park counters that it has standing because it has been economically injured by the defendants' discrimination toward Latino residents. Doc. 62 at 47–49.  The court finds that Green Park does have standing to assert these claims.

Under Article III of the United States Constitution, federal jurisdiction is limited to instances in which a "justiciable 'case or controversy' exists between the litigants." *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth*, 422 U.S. at 498.  Article III standing consists of three elements: (1) injury-in-fact, (2) a

---

[2] While the defendants challenge Green Park's standing for both its FHA and Equal Protection claims, standing under the FHA is "as broad[] as is permitted by Article III of the Constitution." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 98 (1979) (internal quotation marks omitted).  As demonstrated below, Green Park has met its burden to establish Article III standing.

causal connection between the injury and the actionable conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and internal quotation marks omitted). The causal connection between the injury and the conduct must be such that the injury is "fairly traceable to the challenged action of the defendant[s]." *Id.* (alterations adopted and internal quotation marks omitted).

Green Park's allegations leave little question that it has Article III standing to bring suit.  Green Park has alleged that the defendants' actions have caused (and will continue to cause) economic harm to Green Park by preventing it from freely operating its manufactured home parks in Pelham.  And the relief Green Park seeks, including monetary damages and injunctive relief, would redress its alleged injuries by making it whole and ending the defendants' alleged interference with its use of the property.  Accordingly, Green Park's complaint includes allegations that satisfy the constitutional requirements of standing.

In addition to Article III's requirements, courts must "consider three prudential principles when weighing whether judicial restraint requires the dismissal of a party's claims." *Young Apts., Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1039 (11th Cir. 2008); *see also Warth*, 422 U.S. at 499–500 (recognizing "other limits on

the class of persons who may invoke the courts' decisional and remedial powers").

These considerations are:

> 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;
>
> 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and
>
> 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Young Apts.*, 529 F.3d at 1039.

The defendants argue that Green Park cannot assert an Equal Protection claim because its "business relationship" with its tenants is too tenuous to confer "third-party standing." Doc. 57 at 34.  In support of this contention, they cite to *Young Apartments*, 529 F.3d at 1044, where the Eleventh Circuit found that a landlord had third-party standing when its tenants could not have brought suit themselves because they feared "drawing attention to the[ir] immigrant status . . . or their neighbors," "police actions," any "other legal risks."  In that case, the district court had found that a "non-Hispanic" property management company lacked standing to bring a race discrimination claim against a municipality on behalf of its Hispanic tenants. *Id.* at 1039.  The Eleventh Circuit held that this conclusion was incorrect for two reasons: (1) the property management company brought suit to "remedy its *own* mistreatment" and "vindicate its own rights," and (2) prudential considerations

should not have prevented the company from "raising claims that implicate the rights of its Hispanic tenants." *Id.*

In support of the first reason, the Eleventh Circuit noted that "[c]ourts have routinely found that a business has standing to bring § 1983 claims against state officials who are harming its business by discriminating against its customers" based on "the uncontroversial principle that it is unconstitutional for a state actor, motivated by discriminatory animus, to interfere with an individual's right to contract or associate with members of a protected class." *Id.*   Thus, the property management company had "standing to allege that it was injured by [the municipality's] discriminatory actions, regardless of whether such claims might also vindicate the rights of its immigrant tenants." *Id.* at 1040.

The Eleventh Circuit thus found that third-party standing prudential principles weighed in favor of conferring standing on the property management company even though plaintiffs ordinarily may not assert the rights of third parties. *Id.* at 1041. This is because businesses are permitted "to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with [their] business relationship." *Id.*   Third-party standing consists of three elements: (1) an injury-in-fact, (2) a close relation to the third party, and (3) a hindrance to the third party's ability to protect his or her own interests. *Id.* at 1042.

The court already has observed that Green Park has sufficiently alleged an

injury-in-fact in the form of the economic damages it has suffered as a result of the City's alleged discriminatory conduct and interference with its property rights.  And while the defendants take issue with the mere "business relationship" between Green Park and its tenants (despite the *Young Apartments* court's explicit finding that a business relationship may confer standing), the closeness prong asks whether the "identity of interests between plaintiff and the third party are sufficiently close." *Id.* (internal quotation marks omitted).  While a landlord's interests are not necessarily in lockstep with those of its tenants, the *Young Apartments* court found that the interests of the landlord and tenant were sufficiently close because the municipality's alleged conduct threatened both the landlord and the tenants and it would be "difficult (if not impossible) for" the property management company to "vindicate its own rights fully without implicating the rights of its tenants." *Id.* at 1043.

Finally, the court noted that the proper question for the third element in the third-party standing inquiry is "whether the existing plaintiff is uniquely positioned to vindicate the rights of the third-party minorities in question," and whether "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court." *Id.* (internal quotation marks omitted).  In *Young Apartments*, *id.* at 1044, the property management company was uniquely positioned because it had "strong incentives" to bring and pursue its lawsuit based on its "significant financial injury," while its Latino residents may have feared

discrimination from fellow citizens, questions regarding their immigration status, and had concerns about "provoking additional policing measures."

Green Park's allegations in this suit parallel the plaintiff's claims in *Young Apartments*. It has alleged economic injury and its interests are sufficiently close to its tenants because, according to its allegations, both suffer from the discriminatory enforcement of the zoning ordinance at issue: Green Park loses revenue and its Latino tenants lose the ability to obtain affordable housing in Pelham. And Green Park, as a large property management company allegedly suffering significant economic damages and the fear of future losses, is uniquely positioned to vindicate the rights of its tenants, who as Latinos may face the same impediments to bringing suit the court noted in *Young Apartments*, including language barriers, limited financial resources, and the fear of further discrimination. Accordingly, Green Park has satisfied its burden to establish third-party standing.

## C.  Takings

There are four types of challenges to a zoning regulation: (1) a just compensation taking, (2) a due process taking, (3) a substantive due process violation, and (4) an Equal Protection violation. *Eide v. Sarasota County*, 908 F.2d 716, 720 (11th Cir. 1990). Green Park has asserted three of these four theories of liability. The court will address each in turn.

### 1.    *Just Compensation*

The Fifth Amendment's takings clause, applicable to the states through the Fourteenth Amendment, provides that private property cannot "be taken for public use, without just compensation." U.S. Const. amend. V.  Its primary purpose is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The prototypical taking occurs when the government uses its power of eminent domain to gain possession of private property for public use. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).  Here, however, Green Park has alleged a "regulatory taking," which occurs when governmental regulation of private property is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Id.*  "The rub, of course, has been— and remains—how to discern how far is 'too far.'" *Id.* at 538.

The defendants refer specifically to one of the "two relatively narrow categories" the Supreme Court identified in *Lingle*: "regulations that completely deprive an owner of *all* economically beneficial use of her property." *Id.* (internal quotation marks omitted).  But the Court explained that regulatory takings outside of these two categories are governed by the standards established in *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978). *Id.*; *see also Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 626 (9th Cir. 2020) ("When a

regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on the *Penn Central* framework.") (internal quotation marks omitted).  In *Penn Central*, 438 U.S. at 124, the Court had identified several factors to consider in evaluating a potential regulatory taking, including "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."

"The *Penn Central* factors . . . have served as the principal guidelines for resolving regulatory takings claims that do not fall within" one of the two *Lingle* categories. *Lingle*, 544 U.S. at 539.  The inquiry focuses on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Id.* at 540.  Additionally, "'the character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred." *Id.* at 539 (quoting *Penn Central*, 438 U.S. at 124).

When examining the regulation's economic impact on the property owner, courts "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S.

24

470, 497 (1987).   The plaintiff's investment-backed expectations must be "reasonable" based on an objective evaluation of "the regulatory environment at the time of the acquisition of the property." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1350 n.22 (Fed. Cir. 2001) (*en banc*).   Finally, a governmental regulation is less likely to rise to the level of a regulatory taking when it "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.   "Regulations that control development based on density and other traditional zoning concerns are the paradigm of this type of public program." *Quinn v. Bd. of County Comm'rs for Queen Anne's County, Md.*, 86 F.3d 433, 442 (4th Cir. 2017).   The *Penn Central* inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539.   "Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights." *Id.*

Accepting the truth of Green Park's allegations in the Amended Complaint and viewing them in the most favorable light, Green Park has not alleged conduct by the City that is "functionally equivalent to the classic taking" in that the City has appropriated Green Park's property or ousted it from its land. *Lingle*, 544 U.S. at 539.   Green Park instead alleges that the City's enforcement of the zoning

regulation's nonconforming use provision "will destroy the profitability and marketability of the manufactured home park operated by Green Park." Doc. 53 at 26.  Accordingly, Green Park contends that it has been deprived of "all economically viable use" of the property which has "destroyed Green Park's reasonable economic expectation for its investment" when it purchased the property. Doc. 53 at 26. Essentially, Green Park alleges that the property has been "devalued" by the defendants' past actions and future redevelopment plans for the property. Doc. 53 at 26.  But "a reduction in the value of property is not necessarily equated with a taking." *Andrus v. Allard*, 444 U.S. 51, 66 (1979).  And the "loss of future profits— unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." *Id.*  "Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform." *Id.*

Green Park's allegations do not reasonably assert that it has been deprived of "all economically viable use" of the property.  Green Park's complaint instead establishes that the defendants' actions have interfered with just a few of the 415 manufactured home spaces on the property. Doc. 53 at 4, 10–12 & 16–17. Importantly, "[n]ot every diminution in property value caused by a government regulation rises to the level of an unconstitutional taking." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018).  The Federal Circuit has declared that it is "aware of no case in which a court has found a taking where

diminution of value was less than 50 percent." *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (internal quotation marks omitted).  Here, Green Park has not alleged any specific diminution of value, much less that the diminution exceeds 50%.  And Green Park admits that it continues to operate its manufactured home park, so it is implausible that, even viewing its allegations in the most favorable light, the economic impact factor of the *Penn Central* analysis weighs in favor of a regulatory taking.

Green Park also has not alleged that it was previously unaware of the City's plans for redevelopment or of the potential obstacles to the continued operation of a manufactured home park on its property.  The City's Comprehensive Plan (2003) and Redevelopment Plan (July 2016) both were on the books prior to Green Park's purchase of the property.  The 2007 zoning ordinance makes clear that the City will not "encourage [the] survival" of prior nonconforming uses. Doc. 53 at 6.  It also put Green Park on notice that any "nonconforming building or structure" damaged by "fire or other causes" by more than 50 percent of its fair market value could not be rebuilt "except in conformity" with the ordinance. Doc. 53 at 7.  The ordinance further provided that nonconforming uses would be cut off if abandoned for a continuous period of at least 180 days. Doc. 53 at 7.  And Green Park alleges that the "City's attacks on manufactured housing communities commenced" when the Mayor was elected in 2012 and "[s]ince 2012, there has been a marked ramp up of

actions against" Green Park. Doc. 53 at 19 & 20.  Thus, Green Park's allegations do not establish that it was reasonable to assume that the operation of a nonconforming manufactured home park on the property would continue unabated when it purchased the property in August 2016.

Finally, the character of the governmental action at issue weighs against a finding of a regulatory taking because Green Park has not alleged a physical invasion.  Rather, the zoning ordinance, Comprehensive Plan, and Redevelopment Plan more closely resemble a "public program adjusting the benefits and burdens of economic life to promote the common good" since the public would benefit, in the City's apparent view, by the new development of mixed-use commercial and green space. *Lingle*, 544 U.S. at 539.  "Regulations that control development based on density and other traditional zoning concerns are the paradigm of this type of public program." *Quinn*, 862 F.3d at 443.  Because Green Park has not alleged "regulatory actions that are functionally equivalent to the classic taking," *Lingle*, 544 U.S. at 539, Green Park's just compensation takings claim is subject to dismissal.

### 2.    *Due Process*

"The substantive component of the [Fourteenth Amendment's] Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (internal quotation marks omitted).  "Fundamental rights are those rights

created by the Constitution." *Greenbriar Village, LLC v. City of Mountain Brook*, 345 F.3d 1258, 1262 (11th Cir. 2003).  "State-created rights," on the other hand, do not constitute fundamental rights protected by the Constitution. *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292, 1297 (11th Cir. 2019).  "[L]and use rights, as property rights generally, are state-created rights." *Dekalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997).  "[N]on-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, even if the plaintiff alleges that the government acted [arbitrarily] and irrationally." *Greeenbriar Village*, 345 F.3d at 1262; *see also Hillcrest Prop.*, 915 F.3d at 1293 ("[E]xecutive action never gives rise to a substantive-due-process claim unless it infringes on a fundamental right.").  The Eleventh Circuit has observed that a "land-use decision is classic executive, rather than legislative, action." *Hillcrest Prop.*, 915 F.3d at 1293.

The defendants first argue that a substantive due process claim cannot stand because Green Park is challenging an exclusively executive decision, not a legislative one.  But Green Park alleged that, at a minimum, the 2007 zoning ordinance, Comprehensive Plan, and Redevelopment Plan were legislatively adopted by the City Council with the aim of closing manufactured home parks in the City. *See* Doc. 53 at 27–28.  The Mayor of Pelham's statement that the City Council "devise[d] a comprehensive plan that clearly identifies [that] the majority of the sub-

standard housing in Pelham were [sic] manufactured homes" buttresses this conclusion. Doc. 53 at 14.  Accordingly, to the extent Green Park alleges that the enactment of the 2007 zoning ordinance, Comprehensive Plan, and Redevelopment Plan resulted in a denial of its substantive due process rights, the defendants' executive-action argument does not foreclose Green Park's claim.

"When state-created rights are infringed by a legislative act, the substantive component of the Due Process Clause generally protects [an entity] from arbitrary and irrational government action." *Hillcrest Prop.*, 915 F.3d at 1299 (internal quotation marks omitted).  "Prospective zoning-type decisions made by an elected body are often legislative or quasi-legislative." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014).  Because Green Park has challenged the legislative adoption of the 2007 zoning ordinance, Comprehensive Plan, and Redevelopment Plan, its claim that the City acted arbitrarily and capriciously may be viable.  Green Park essentially has alleged that the City's patchwork legislative scheme is part and parcel of an overall strategy to reduce the City's Latino population by closing manufactured home parks.  This claim would be analyzed under a rational basis standard. *See id.* ("Substantive due process challenges that do not implicate fundamental rights are reviewed under a rational basis standard.").

"Under rational basis scrutiny, governments are not required to convince the courts of the correctness of their legislative judgments." *Id.* at 1281 (internal

quotation marks omitted).  Instead, the plaintiff "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* (internal quotation marks omitted).  As Green Park concedes, this standard is "highly deferential," and courts "hold legislative acts unconstitutional under a rational basis standard in only the most exceptional of circumstances." *Id.*  Even so, Green Park has alleged that "whether a home is a manufactured home is not a rational proxy for health, safety, or general community welfare." Doc. 53 at 28.  It asserts that the City's actions have "not been rationally related to a legitimate government purpose," and that the City instead has had "a specific intent to destroy the economic viability of [Green Park's p]roperty and to force the residents of the [p]roperty, who are disproportionately of Hispanic/Latino origin, to leave the City." Doc. 53 at 28.  At the motion-to-dismiss stage, these facts state a viable substantive due process claim.

### 3.    *Equal Protection*

The defendants argue that Green Park's equal protection claim must fail because their enforcement of the zoning ordinance affects all manufactured home parks equally and without regard to the residents' race or ethnicity.  Green Park counters that even facially neutral laws violate the Equal Protection Clause if they are adopted with the specific intent to discriminate against a particular class of people. *See Johnson v. Gov. of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005) (*en banc*)

31

("A facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group.").

A facially neutral law is unconstitutional "if (1) discrimination was a substantial or motivating factor in the government's enactment of the law, and (2) the government cannot rebut that claim by showing that the provision would have been enacted in the absence of any racially discriminatory motive." *Young Apts.*, 529 F.3d at 1044–45 (internal quotation marks omitted). The determination of whether a discriminatory purpose was a motivating factor behind a certain statute or ordinance "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Included in this inquiry are considerations ranging from the impact of the statute on a particular race and the historical background behind the legislative decision to "the specific sequence of events in the state's decision-making process." *Young Apts.*, 529 F.3d at 1045; *see also Arlington Heights*, 429 U.S. at 266–68.

By necessity, this is an intensely evidence-based inquiry. As already noted, the discovery sought by Green Park is directly relevant to this inquiry and will shed light on whether the City acted with any discriminatory animus, underscoring the prematurity of summary judgment on this claim. For present purposes, Green Park has alleged that the City's passage and enforcement of the 2007 zoning ordinance

and implementation of the Comprehensive Plan and Redevelopment Plan were substantially motivated by discrimination against its Latino residents. Doc. 53 at 37. And it claims that the impact of the City's discriminatory conduct is the deprivation of affordable housing for Latino residents in Pelham. Doc. 53 at 37. On these facts, Green Park has alleged a viable § 1983 claim for a violation of the Equal Protection Clause.

**B.    Fair Housing Act**

*1.    Discrimination*

The Fair Housing Act ("FHA") prohibits the refusal "to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). "[T]o prevail on a claim under the FHA, a plaintiff must demonstrate unequal treatment on the basis of race that affects the availability of housing." *Hallmark Dev., Inc. v. Fulton Cty, Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006) (internal quotation marks omitted). "Housing may become unavailable within the meaning of the FHA as a result of zoning decisions that effectively prohibit the construction of housing." *Id.*

"To prove that a zoning decision was based on intentional discrimination, a plaintiff must establish that race played some role in the decision." *Id.* (internal quotation marks omitted). To determine whether race played some role in a zoning decision, courts consider the *Arlington Heights* factors: discriminatory effect of the

decision, historical background, the specific sequence of events preceding the decision, and "whether there were any departures from normal or substantive criteria." *Id.* (internal quotation marks omitted).

Green Park has alleged sufficient facts to state a discrimination claim under the FHA.  Green Park alleges that the City of Pelham saw a 246 percent increase in its Latino population between 2000 and 2010 and that a "substantial majority" of the residents of its manufactured home parks are Latino. Doc. 53 at 29–30.  Green Park contends that, based on their socioeconomic status and housing costs, manufactured home parks "constitute a substantial portion of the City's rental housing stock that is affordable" for the City's Latino residents. Doc. 53 at 31.  Accordingly, preventing Green Park from operating its manufactured home parks "would have a significantly adverse and disproportionate and disparate impact on" the City's Latino residents because there is "no alternative housing that is truly comparable in price, type, location, convenience, and amenities." Doc. 53 at 32.

Green Park further asserts that the defendants have sought to "make persons of Latino/Hispanic origin move elsewhere" by discouraging the use of manufactured homes. Doc. 53 at 33.  By these facts, Green Park adequately alleges that the defendants' actions disproportionately impact Latino residents and that the defendants had no other rational justification for seeking to eliminate manufactured homes. *See, e.g.*, *Tex. Dept. of Hous. & Comm. Affairs v. Inclusive Comms.*, 135 S.

34

Ct. 2507, 2521–22 ("[U]nlawful practices [under the FHA] include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification.").  Accordingly, Green Park has met its burden at the pleading stage to establish a viable claim for discrimination under the FHA. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) ("[T]he allegations in the complaint should be judged by the statutory elements of an FHA claim rather than the structure of the *prima facie* case.") (internal quotation marks omitted).

### 2.    *Interference*

Green Park also asserts a claim for interference with its FHA rights.  To state a claim for FHA interference under 42 U.S.C. § 3617, Green Park must allege that the defendants interfered with either its exercise of a right under the FHA, its enjoyment of a right under FHA, or its aiding or encouragement of a person belonging to a protected class to exercise a right under the FHA. *Noah v. Assor*, 379 F. Supp. 3d 1284, 1289 (S.D. Fla. 2019).  While the Eleventh Circuit has not defined the precise contours of conduct violative of the FHA's interference provision, district courts within the circuit "agree that Section 3617 extends only to discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights." *Id.* (internal quotation marks omitted).  But other courts, including the Sixth Circuit, have found

that "the language 'interfere with' should be broadly interpreted to reach all practices which have the effect of interfering with housing rights." *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 638 (6th Cir. 2017).

Since it filed suit, Green Park alleges that the City has schemed to block electrical permits, causing certain lots to remain vacant for a period of 180 days, and then deemed these lots "abandoned" under a provision of the City's zoning ordinance prohibiting the nonconforming use of a property if that use has been discontinued for at least 180 days. Doc. 53 at 18.  Green Park also claims that Miller, the City's building official, has wrongfully denied its permit requests, refused to issue decisions in writing, and refused to communicate directly with Green Park (instead referring Green Park's inquiries to the City's attorney). Doc. 53 at 17 & 21. Finally, Green Park claims that Pelham police issued citations to approximately ten residents for "yard parking" in July 2019 under a City ordinance that has been repealed and is invalid. Doc. 53 at 18.  The residents' vehicles were parked in spots that have been used for vehicle parking "for years without any warning or sanction from the City." Doc. 53 at 18.  This action was "intended to intimidate and harass [Green Park's] residents because the warnings have no legitimate law enforcement justification." Doc. 53 at 19.

These allegations are flawed in two significant ways.  First, this alleged conduct is not "so severe or pervasive" that it would effectively cause Green Park

itself or its residents to "abandon the exercise of [their] housing rights."  The allegations amount to a strict enforcement of zoning regulations and a referral by a City employee to the City's attorney for communication after the initiation of legal proceedings.  Similarly, the "yard parking" tickets, which were issued on one occasion to about ten residents, are neither severe nor pervasive.  Moreover, Green Park has not identified the specific "right under Sections 3603–3606" exercised by Green Park or its residents with which the City has interfered. *Noah*, 379 F. Supp. 3d at 1294.  Thus, the court concludes that Green Park's complaint does not allege a viable interference claim under the FHA.

## C.    Declaratory and Injunctive Relief

Green Park seeks a declaratory judgment construing the zoning ordinance in accordance with the protections to which it is entitled under the Alabama and United States Constitutions, delineating the parties' rights and obligations under the zoning ordinance, and declaring that Green Park "has a vested property right in the nonconforming use of [the property] as a manufactured home park," including the right to place new homes on vacant spaces. Doc. 53 at 24.  Green Park also seeks an order enjoining the defendants from construing and applying the zoning ordinance "in violation of Green Park's vested property right in the nonconforming use of the property," and enjoining the defendants from "otherwise preventing Green Park from exercising its vested property rights." Doc. 53 at 25.

37

The defendants argue, without citation to any authority, that because there is a "state court order in place which affirms the City's right to prevent" the nonconforming use sought by Green Park, the equitable relief Green Park seeks "conflicts" with the state-court order and is "premature." Doc. 57 at 39.  For the same reasons the court cannot engage in a summary judgment analysis of the causes of action stated by Green Park, the court cannot find that Green Park's requested declaratory and injunctive relief should be dismissed.  Green Park will have the ability to demonstrate its entitlement to this relief on the basis of the information obtained through the discovery process, at which point the defendants can renew their motion for summary judgment if the record fails to support Green Park's requests.

## V.  CONCLUSION

For these reasons, the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 57) is GRANTED in part and DENIED in part, and Green Park's just compensation takings claim and its claim for interference with its Fair Housing Act rights are DISMISSED with prejudice.

DONE and ORDERED on August 24, 2020.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE